Felice K. Shea, J.
In this paternity proceeding pursuant to article 5 of the Family Court Act the court must decide what legal effect to give conflicting blood grouping test reports, only one of which excludes respondent as the father of petitioner’s out-of-wedlock child.
In New York, the report of a nonexclusionary blood grouping test is not admissible into evidence to prove paternity, on the theory that the probative value of such a report is not great enough to counterbalance its possible prejudicial effect. (Family Ct. Act, §§418, 532.)[1] On the other hand, in the absence of contradictory evidence, New York courts give conclusive weight to an exclusionary blood grouping test. (Clark v Rysedorph, 281 App Div 121; "C.” v "C.”, 200 Misc 631; Cuneo v Cuneo, 198 Misc 240; "Saks” v "Saks”, 189 Misc 667.)
BLOOD GROUPING TESTS
The instant paternity petition was filed in July, 1971. Re *686 spondent denied that he was the father of petitioner’s infant, and requested a blood grouping test, which was performed by Dr. Robert L. Rosenthal. A report dated November 18, 1971 was sent to this court in which Dr. Rosenthal listed the tests performed and the results obtained, and in which he stated: "Paternity is excluded by the MN groupings.”[2]
On January 12, 1972, the court ordered a second blood grouping test at the request of the Assistant Corporation Counsel who represented the petitioner. Respondent was present without counsel and the record does not reveal any objection made by him.[3] The results of this second blood test, performed by Dr. Alexander S. Wiener, were nonexclusionary. Dr. Wiener found the child’s blood to be positive for the factor N, whereas Dr. Rosenthal’s test had shown the child’s blood to be negative for the factor N.[4]
Thereafter, in April, 1972, respondent’s attorney requested that a third blood grouping test be made by yet a different doctor selected from the court’s list,[5] and pursuant to court *687 order, Dr. Richard E. Rosenfield performed a blood grouping test which again failed to exclude respondent.
On May 16, 1972, the court ordered a fourth test. The report of this final test was signed by both Dr. Rosenthal and Dr. Rosenfield and did not exclude respondent as the possible father of petitioner’s child. The report, dated October 21, 1974, stated, in part: "2. If weak but otherwise satisfactory anti-N reagents are used, the child types as M which, on the basis of a two allele genetic hypothesis, would exclude the type N putative father. We used four examples of rabbit anti-N and all four weakly distinguished the child from normal type M control blood. Two weaker rabbit anti-N, and an extract of vicia gramínea seeds, did not distinguish the child from normal type M. Nonetheless, the child must be considered as type MN2. This does not exclude the putative father because he could be N/N2.”
When the matter came on for hearing, this court, upon stipulation of the parties, admitted into evidence the results of all the blood tests performed and heard expert testimony for the purpose of determining whether or not respondent could be adjudged excluded.
Dr. Robert L. Rosenthal testified that he has been licensed to practice medicine since 1947; that he is a hematologist affiliated with Mount Sinai and Queens General Hospitals; and that he is in charge of the hematology department at Joint Diseases Hospital as well as associate clinical professor at Mount Sinai Hospital. Dr. Rosenthal testified that he performs between 150 and 200 blood grouping tests per year, many by order of the Family Court, and that he has been performing such tests for more than 20 years. Dr. Rosenthal described the testing methods he uses and the precautions he takes to avoid erroneous identification of the parties or mislabeling of the blood samples.
In October, 1974, Dr. Rosenthal repeated his tests after learning that the tests conducted by two other doctors contradicted his results. His additional tests produced the same exclusionary result each time they were done. The explanation given by Dr. Rosenthal for the difference between his test results and those of the other doctors was that he used a *688 weaker anti-N reagent than did the other two doctors. According to Dr. Rosenthal, the serum, or reagent, which he used was obtained commercially, whereas the sera used by those doctors he termed "super-specialists” were made by the doctors themselves and were more sensitive and therefore more accurate.[6] Dr. Rosenthal testified further that if more sensitive sera were to be used in lieu of commercial sera in all blood tests made by court order, the results in many cases would be different.[7]
The petitioner called Dr. Alexander S. Wiener as her witness and respondent conceded his qualifications as an expert. Dr. Wiener is one of the foremost hematologists and serologists in the country, and a pioneer in the development and use of blood grouping tests in disputed paternity proceedings.[8] Dr. Wiener testified that he has done thousands of blood grouping tests, about three fourths of which were ordered by the Family Court.
Dr. Wiener identified his report, which did not exclude respondent, and described the tests he had performed on the blood of petitioner, respondent and the infant. At the time the tests were performed, Dr. Wiener had not known of the previous test conducted by Dr. Rosenthal. Dr. Wiener testified that he used sera he had made himself which were more sensitive and of higher quality than sera available commercially. Dr. Wiener stated that there was more chance for an erroneous result with commercial sera and therefore he makes his own. According to Dr. Wiener, commercial sera contain fewer antibodies, have a slower reaction time and are generally of lower caliber. He testified that Dr. Rosenfield, who performed the third blood grouping test on these parties, also makes his own sera. Dr. Wiener described the method he *689 uses in running control tests on blood samples of known specificities so that errors are precluded. He further testified that the child herein had a rare subtype of the factor N, namely N2, but that his nonexclusionary results were reached without this information, which was given to him later by Dr. Rosenfield and which he independently verified. Lastly, Dr. Wiener testified that it was possible to predict the probability that respondent was the father, but that he had not made such a computation.[9]
After considering the four blood grouping test reports and the expert testimony of two serologists, the court holds that respondent cannot be excluded as the father of petitioner’s child. The doctor who performed the first test conceded that his exclusionary result may have been an error caused by the use of reagents which were weaker and less sensitive than those used in the subsequent, nonexclusionary tests, and he signed a later report in which he concurred with the nonexclusionary result.
The court, finding that respondent cannot be excluded, is bound by section 532 of the Family Court Act, discussed supra, to disregard the nonexclusionary blood test results and to consider only the proof adduced by the parties. There is no prejudice in taking nonexclusionary blood test reports into evidence so long as the court does not consider them in reaching its decision. (People v Kelly, 20 AD2d 740.)[10] Indeed, in actual practice in New York City, nonexclusionary blood grouping test results are part of the record, available to the Trial Judge, in virtually every contested filiation proceeding. Even were the court to avoid examining the test results in the record, it would have to be presumed in almost every case that a blood test had been performed and that the matter would not have come to trial if the results had been exclusionary.
THE FACTS
Petitioner testified that she was a single woman and that she met respondent through her brother, who played in the same band in which respondent performed as a singer. Pe *690 titioner stated that she and respondent were acquaintances, that they never went out together, never had a meal alone together, but that they had four sexual contacts — two in the summer of 1969 in a friend’s car at 3:00 or 4:00 a.m. after dances, once in January, 1970, at petitioner’s home, and once at the end of February or beginning of March, 1970, in Puerto Rico. It was this last sexual act which petitioner claimed caused her pregnancy and the subsequent birth of a daughter on December 25, 1970, when petitioner was 20 years old.
Petitioner testified that her last menstrual period before the baby’s birth was at the end of February or beginning of March, that it lasted 6 or 7 days, and that it ended before she arrived in Puerto Rico on a Friday. On cross-examination, petitioner placed the date of her arrival in Puerto Rico as February 27, 1970. Petitioner further testified that she was a virgin until her first sexual act with respondent and that she had no sexual contacts with any other man until after the birth of the baby.
Petitioner contended that her baby was post-mature and had been born approximately 300 days after conception. She called, as an expert witness, Dr. Gabriel Kirschenbaum, who served for 16 years on the staff of Greenpoint Hospital in the Department of Gynecology and Obstetrics. Dr. Kirschenbaum testified that it was entirely possible, although he refused to say how probable, that a baby conceived at the end of February, 1970, could be born on December 25, 1970. He conceded that a 300-day pregnancy did not occur "every day in the week” and that the probability became less with each day after the average gestation period of 240 to 280 days. Hospital records of petitioner and the baby were not offered in evidence.
Respondent was 48 years old at the time of the events in question and he testified to substantially the same facts as the petitioner, with the exception that he denied having sexual intercourse with her after the summer of 1969. Respondent’s testimony, which was corroborated by a friend who worked with him, was that he went to Puerto Rico for the Washington’s Birthday weekend in 1970 where he was invited to perform as a singer. February 22, 1970 was a Sunday, and respondent testified that he stayed in Puerto Rico until Wednesday, February 25, when he returned to New York. Respondent denied that he saw petitioner in Puerto Rico and testified that he was told of petitioner’s pregnancy by her mother *691 several months later. Both parties agreed that respondent had never visited or supported the baby and that he had not acknowledged her as his child.
Respondent introduced into evidence a letter from petitioner to a female friend written from Puerto Rico in July, 1970, when petitioner was four months pregnant. In the letter, petitioner confided that she was looking for a husband and gave details of her social life with several men. On one evening, she stayed out with a male friend until 7:00 A.M., and on cross-examination petitioner admitted to intercourse with this friend, although she claimed it did not occur until after the baby was born. Respondent was referred to casually in the letter, but petitioner admitted that she did not see or talk to him while she was in Puerto Rico in July, although respondent was also there.
Respondent also offered in evidence a record of petitioner’s prenatal care at Lincoln Hospital in which she gave the date of her last menstrual period as February 27,1970. This date is consistent with petitioner’s bill of particulars which placed her last menstrual period at the end of February, but is inconsistent with petitioner’s testimony at trial.
CONCLUSION
Paternity proceedings are considered civil in nature and are governed by the CPLR, absent specific provisions of the Family Court Act. (Matter of Green v Smith, 65 Misc 2d 588.) However, in view of the burdensome consequences for the respondent in a filiation proceeding and the difficulty in meeting a charge of paternity, the courts have imposed a heavy burden of proof on the petitioner. The evidence must be more than preponderant and must convince to the point of entire satisfaction. (Matter of Dorn "HH” v Lawrence "II”, 31 NY2d 154; Commissioner of Welfare v Nestasi, 6 AD2d 680; Matter of Beverly W. v Scott D., 37 AD2d 904; Matter of Bayne v Willard, 46 Misc 2d 1079.)
The court finds that the evidence before it casts considerable doubt on petitioner’s version of the facts and upon her credibility. The casual nature of the acquaintanceship of the parties and the behavior of the petitioner with other men during her pregnancy raise questions as to her alleged chastity. The hospital record of petitioner’s prenatal care, made from information given by petitioner at a time close to the actual event, is more worthy of belief than petitioner’s contra *692 dictory testimony in court. Petitioner was vague as to the date of the crucial act of intercourse. Respondent’s recollection was clear as to when he was in Puerto Rico and was corroborated by a fellow worker.
In addition, the court draws an unfavorable inference from the failure of petitioner to offer in evidence her hospital records, which she had subpoenaed and which were in court. (Reehil v Fraas, 129 App Div 563, revd on other grounds 197 NY 64; Richardson, Evidence [10th ed, 1973], § 92.) The court infers that the records withheld would not have supported or corroborated the proof offered by petitioner that the baby was post-mature.[11] (See Laffin v Ryan, 4 AD2d 21.)
Under all the circumstances and after considering all the proof, the court finds that petitioner has not sustained her burden of proving, by clear and convincing evidence, to the satisfaction of the court, that respondent is the father of her child.
Petition dismissed.

. Cf. Uniform Act on Paternity, § 10, approved in 1960 by the National Conference of Commissioners on Uniform State Laws: "If the experts conclude that the blood tests show the possibility of the alleged father’s paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the blood type.” See, also, Uniform Act on Blood Tests to Determine Paternity, § 4; Uniform Parentage Act, § 12(3). Thirteen States and one territory admit blood test evidence of the possibility or probability of paternity. As to the admissibility of blood typing evidence generally, see Krause, Scientific Evidence and the Ascertainment of Paternity, 5 Fam LQ 252, 261-270; Blood Grouping Tests, 46 ALR2d 1000, § 7 et seq. (1956).

. Blood grouping tests are based upon the Mendelian laws of inheritance and have been described for nonmedical laymen many times. See Krause, supra, n 1, p 255 et seq., and authorities cited therein; S. Schatkin, Disputed Paternity Proceedings, pp 112-153 (4th ed, 1967).

. Cf. Matter of Brian v Johns (78 Misc 2d 219) where the Family Court denied petitioner’s request for a second blood grouping test on the ground that section 532 of the Family Court Act provides no authority for the court to order a second test, or indeed any test at all, over respondent’s objection. In contrast to section 532 of the Family Court Act, section 418 of the Family Court Act which governs support actions, gives the court specific authorization to order blood grouping tests on its own motion. Apparently, in the former Court of Special Sessions, which had jurisdiction in filiation cases in the City of New York before 1962, the practice was to submit all reports of exclusion of paternity to an independent expert for verification. Wiener, Blood Grouping Tests in Disputed Parentage: Qualification of Experts, 3 J For Med 139, n at 140 (1956). See, also, Uniform Parentage Act, § 11(b), Uniform Act on Paternity, § 7; Uniform Act on Blood Tests to Determine Paternity, §§ 1, 2.

. Dr. Wiener’s report showed that Angel Cruz had blood type N; Matilda Torino had blood type MN; the infant had blood type MN. The report stated that: "According to the laws of heredity, the agglutinogens M and N cannot appear in the blood of a child unless present in one or both parents * * * Since the infant is type MN, there is nothing in her blood that is incompatible with these requirements.”

. The Family Court in New York City has a list of hematologists which is given to parties in a filiation proceeding when the court orders a blood grouping test. The respondent may select any qualified doctor, but he ordinarily chooses a name from the court’s list. The list was compiled in 1954 when Dr. H. D. Kruse, then executive secretary of the New York Academy of Medicine, submitted 16 approved names to the Honorable John Warren Hill, then Presiding Justice of the Domestic Relations Court of the City of New York, forerunner of the present Family Court. Since 1954, 10 doctors have been dropped from the list, presumably at their own request or when they retired from practice. During the same period, four names have been added to *687 the list. Inquiry has not revealed any procedure by which a doctor adds his name to the list nor how his qualifications are evaluated. For critical comment on the court list, see Wiener, Problems and Pitfalls in Blood Grouping Tests for Non-Parentage, 15 J For Med 106, 121 (1968).

. For discussion of weak reagents as a cause of false exclusionary test results, see Wiener, Problems and Pitfalls in Blood Grouping Tests for Non-Parentage, 15 J For Med 106, 116, 124 (1968); Wiener, Blood Grouping Tests in Disputed Parentage, Qualifications of Experts, 3 J For Med 139,140 (1956); Littell and Sturgeon, Defects in Discovery and Testing Procedures: Two Problems in the Medicolegal Application of Blood Grouping Tests, 5 UCLA L Rev 629, 639 (1958).

. Scandinavian countries and the United States Army maintain central blood typing laboratories which provide standardized blood sera and testing procedures. Krause, supra, n 1 at 267; Krause, Uniform Parentage Act, 8 Fam LQ 1, 10; see proposed rules of Dept, of Health, Education and Welfare, 45 CFR 303.5(2)(b) implementing the social services amendments of 1974, Pub L 93-647 (Jan. 4, 1975), US Code, tit 42, 652-660.

. See Matter of Crouse v Crouse (51 Misc 2d 649), a case in which Dr. Wiener performed a blood grouping test in open court.

. Evidence as to probability of paternity is not admissible in New York. See n 1, supra.

. Cf. People ex rel. Sheridan v Curl (275 App Div 966) and Matter of Cardinal v Green (30 AD2d 711) where it was held to be reversible error for a trial court to rely on nonexclusionary blood tests in making a finding of paternity.

. For discussion of statistical probabilities of abnormal periods of gestation in relation to length, weight and development of an infant see Krause, supra, n 1, pp 273-276; ,S. Schatkin, supra, pp 718-733, n 2.